**REICH RADCLIFFE & HOOVER LLP**
Marc G. Reich (SBN 159936)
Email: mgr@reichradcliffe.com
Adam T. Hoover (SBN 243226)
adhoover@reichradcliffe.com
2030 Main Street, Suite 1300
Irvine, CA 92614
Phone: (949) 975-0512
Fax: (949) 203-2839

**LIFSHITZ LAW PLLC**
Joshua M. Lifshitz (Pro Hac Vice to be submitted)
jlifshitz@lifshitzlaw.com
1190 Broadway
Hewlett, NY 11557
Phone: (516) 493-9780
Fax: (516) 280-7376
*Attorneys for Plaintiff Steve Schnipper*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEVE SCHNIPPER, Derivatively on Behalf of Nominal Defendant NVIDIA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>JEN-HSUN “JENSEN” HUANG, COLETTE M. KRESS, HARVEY C. JONES, TENCH COXE, JOHN O. DABIRI, DAWN HUDSON, SUZANNE NORA JOHNSON, MELISSA B. LORA, STEPHEN C. NEAL, A. BROOKE SEAWELL, AARTI SHAH, MARK A. STEVENS, and PERSIS DRELL, | Case No.: 3:26-cv-14131<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Defendants,

and

NVIDIA CORPORATION,

Nominal Defendant.

By and through his undersigned counsel, Plaintiff Steve Schnipper ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant NVIDIA Corporation ("NVIDIA" or the "Company") and against certain current and former officers and directors of the Company for violations of section 14(a) of the Exchange Act, contribution under section 10(b) of the Exchange Act, Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act, breaches of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by NVIDIA and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on NVIDIA's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Kistenmacher v. NVIDIA Corporation, et al.*, Case No. 26-cv-13448 (N.D. Cal.) (the "Related Securities Action"); and (e) review of other publicly available information concerning NVIDIA and the Defendants.

## NATURE OF THE ACTION

1. Plaintiff brings this action derivatively for the benefit of Nominal Defendant NVIDIA against certain of the Company's current and former executive officers and directors aiming to rectify the Defendants' breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately October 9, 2025, to the present (the "Relevant Period").[1]

2. NVIDIA is a multinational technology company incorporated in Delaware and headquartered in Santa Clara, California. NVIDIA is engaged in the production and sale of graphics processing units (GPUs), systems on chips (SoCs), and application programming interfaces (APIs) used in gaming, data science, high-performance computing, artificial intelligence (AI) hardware, and mobile and automotive applications.

3. NVIDIA was founded in 1993 by Defendant Huang alongside his co-founders, Chris Malachowsky and Curtis Priem. Originally, NVIDIA was focused primarily on developing GPUs for gaming, but in recent years the Company's focus has shifted towards producing full-stack AI infrastructure, including hardware, platform software, networking, framework integration, and cloud services.

4. Due to NVIDIA's meteoric rise as a provider of chips for the AI industry, the Company has come under intense regulatory and national security scrutiny in recent years. As a result, the United States government has forbade NVIDIA from

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately October 9, 2025, to November 8, 2026; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

exporting its chips to China—compliance with the ban on sales of chips to China and the further protection of NVIDIA's technology from being stolen by foreign agents is critical to maintaining the Company's good relationship with the U.S. government, its overall reputation, and thus its financial performance.

5. Beginning on October 9, 2025, NVIDIA has come under significant media and regulatory scrutiny related to an alleged connection between the Company and a Singaporean firm known as Megaspeed. Megaspeed has been under investigation by the United States government since late 2024, and was further investigated by the Singaporean government throughout 2025.

6. The connection between NVIDIA and Megaspeed stems from a relationship between NVIDIA's former CEO and Director Jensen Huang, who had been spotted socializing with an executive from Megaspeed named Alice Huang (no relation to Defendant Huang). Alice Huang was interviewed by the Singaporean government as part of its investigation into Megaspeed in 2025.

7. As it turns out, Defendant Huang and Alice Huang were not just socializing, but were embroiled in an affair where the two maintained a sexual relationship. To make matters worse, as reported by The New York Times on October 29, 2026, Alice Huang, also known as Huang Le, American officials had concluded over a year ago that Alice Huang was a Chinese intelligence asset funneling information to Beijing. Indeed, the U.S. government has suspected that Alice Huang has been acting as an intermediary to direct NVIDIA's AI chips to China.

8. In an October 9, 2025, New York Times article, an NVIDIA spokesperson reported that the Company's compliance team looked into Megaspeed and determined that it was "wholly owned and operated by a company based and headquartered outside China, with no China shareholders." In fact, the spokesperson, John Rizzo, reported that NVIDIA had visited Megaspeed's data center facilities multiple times and "found no evidence of diversion"—this account is in direct conflict

with the findings of a U.S. Commerce Department official who visited a Megaspeed data center in 2024 and found it to be "suspicious," which was the basis for the U.S. government's investigation into the Singaporean company in late 2024.

9. On November 8, 2026, after months of mounting suspicion, Defendant Huang disclosed to the Company's Board that he had been maintaining a sexual relationship with Alice Huang. After the official announcement of Defendant Huang's infidelity, the Board finally decided to launch an "independent investigation" into the matter, but publicly reported that it had "no reason to believe" that national security or NVIDIA's trade secrets were at risk. During the interim, Defendant Huang remained at the helm of the Company and as a member of that Board.

10. On November 9, 2026, the next trading day after the truth was revealed, NVIDIA's stock price fell $7.97 per share, or roughly 4.3%. Since then, the Company's stock price has only continued to fall, and currently sits at $159.00 as of market open on November 16, 2026, constituting a decrease in value of $27.64 or 14.8%.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

12. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

13. Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation within this district by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## PARTIES

**A. Plaintiff**

14. Plaintiff was a shareholder prior to the start of the Relevant Period, is currently, and has continuously been, a holder of NVIDIA common stock.

**B. Nominal Defendant**

15. Nominal Defendant NVIDIA is incorporated in Delaware and its current principal executive offices are located at 2788 San Thomas Expressway, Santa Clara, California, 95051. The Company's common stock trades on the NASDAQ (the "NASDAQ") under the ticker symbol "NVDA."

**C. Defendants**

16. Defendant Jen-Hsun "Jensen" Huang ("Huang") served as the President and Chief Executive Officer ("CEO") of NVIDIA, as well as a member of the Company's Board of Directors (the "Board") at all relevant times up until November 12, 2026. For the fiscal years of 2025 and 2026, Huang received $32,000,000 and $36,000,000 in total compensation, respectively.2 Defendant Huang is named as a defendant in the Related Securities Action.

17. Defendant Huang is referred to herein as the "Securities Action Defendants."

18. Defendant Colette M. Kress ("Kress") serves as the Interim Chief Executive Officer ("CEO") of NVIDIA as of November 12, 2026. Kress has also served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since 2013. For the fiscal years of 2025 and 2026, Kress received and/or will receive $16,000,000 and $18,000,000 in total compensation, respectively. Defendant Huang is named as a defendant in the Related Securities Action.

---

[2] Includes salary, stock awards, option awards, non-equity incentive plan compensation and all other compensation.

19. Defendant Harvey C. Jones ("Jones") serves as the Chairman of the Board and has been a member of the Board since 1993. Defendant Jones is a member of the Audit Committee and the Nominating and Corporate Governance Committee. For the fiscal years of 2025 and 2026, Jones received and/or will receive $343,828 and $363,809 in total compensation, respectively.

20. Defendant Tench Coxe ("Coxe") has been a member of the Board since 1993. Defendant Coxe is a member of the Audit Committee and the Compensation Committee. For the fiscal years of 2025 and 2026, Coxe received and/or will receive $343,828 and $363,809 in total compensation, respectively.

21. Defendant John O. Dabiri ("Dabiri") has been a member of the Board since 2020. Defendant Dabiri is a member of the Compensation Committee and the Nominating and Corporate Governance Committee. For the fiscal years of 2025 and 2026, Dabiri received and/or will receive $343,828 and $363,809 in total compensation, respectively.

22. Defendant Dawn Hudson ("Hudson") has been a member of the Board since 2013. Defendant Hudson is Chair of the Compensation Committee. For the fiscal years of 2025 and 2026, Hudson received and/or will receive $343,828 and $363,809 in total compensation, respectively.

23. Defendant Suzanne Nora Johnson ("Johnson") has been a member of the Board since July 2026. Defendant Johnson is a member of the Audit Committee.

24. Defendant Melissa B. Lora ("Lora") has been a member of the Board since 2023. Defendant Lora is a member of the Audit Committee and the Nominating and Corporate Governance Committee. For the fiscal years of 2025 and 2026, Lora received and/or will receive $343,828 and $363,809 in total compensation, respectively.

25. Defendant Stephen C. Neal ("Neal") has been a member of the Board since 2019 Defendant Neal is Chair of the Nominating and Corporate Governance

Committee. For the fiscal years of 2025 and 2026, Neal received and/or will receive $343,828 and $363,809 in total compensation, respectively.

26. Defendant A. Brooke Seawell ("Seawell") has been a member of the Board since 1997. Defendant Seawell is Chair of the Audit Committee. For the fiscal years of 2025 and 2026, Seawell received and/or will receive $343,828 and $363,809 in total compensation, respectively.

27. Defendant Aarti Shah ("Shah") has been a member of the Board since 2020. Defendant Shah is a member of the Audit Committee and the Compensation Committee. For the fiscal years of 2025 and 2026, Shah received and/or will receive $343,828 and $363,809 in total compensation, respectively.

28. Defendant Mark A. Stevens ("Stevens") has been a member of the Board since 2008, and previously served as a member of the Board from 1993 until 2006. Defendant Stevens is a member of the Compensation Committee and the Nominating and Corporate Governance Committee. For the fiscal years of 2025 and 2026, Stevens received and/or will receive $343,828 and $363,809 in total compensation, respectively.

29. Defendant Persis Drell ("Drell") served as a member of the Board at all relevant times up until January 2026. For the fiscal years of 2025 and 2026, Drell received and/or will receive $343,828 and $363,809 in total compensation, respectively.

30. Defendants Huang, Jones, Coxe, Dabiri, Hudson, Johnson, Lora, Neal, Seawell, Shah, Stevens, and Drell are collectively referred to herein as the "Director Defendants."

31. The Director Defendants along with the Securities Action Defendants are referred to collectively herein as the "Individual Defendants."

32. The Individual Defendants along with NVIDIA are known collectively as the "Defendants."

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

33. By reason of their positions as officers, directors, and/or fiduciaries of NVIDIA, and because of their ability to control the business and corporate affairs of NVIDIA, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage NVIDIA in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of NVIDIA and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

34. Each director and officer of the Company owes to NVIDIA and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

35. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Duties of the Members of the Audit Committee**

36. Pursuant to the Audit Committee Charter of NVIDIA (effective as of March 3, 2025)3, the purpose of the Audit Committee is set forth in the Audit Committee Charter as follows:

[3] Available at https://s201.q4cdn.com/141608511/files/doc_governance/2025/Mar/07/NVIDIA-AC-Charter-March-3-2025-573883.pdf.

The purpose of the Committee shall be to act on behalf of the Board to fulfill the Board's oversight responsibilities with respect to the Company's corporate accounting and reporting practices and the quality and integrity of the financial statements, reports and systems of internal control over financial reporting, as well as the qualifications, independence and performance of the Auditors. The Committee shall also provide oversight of the Company's compliance with related legal, regulatory, and ethical requirements and compliance programs as established by management. The policy of the Committee in discharging these obligations shall be to maintain and foster an open avenue of communication between the Committee, the Internal Auditors, the Auditors, and the Company's financial management.

37. Concerning the Audit Committee's review procedures, the Audit Committee Charter states:

1. Review and reassess annually the adequacy of this Charter and submit any suggested changes to the Charter to the Board for its consideration.

2. Review and recommend to the Board, upon completion of the annual audit, the financial statements, any internal controls report, and as appropriate, "Risk Factors" to be included in the Company's Annual Report on Form 10-K and any internal controls report. Review should include oversight of the Auditors' assessment of the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments and estimates (including material changes in estimates), the nature of significant risks and exposures, any audit

adjustments noted or proposed by the Auditors (whether "passed" or implemented in the financial statements), the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors.

3. Review, in consultation with management, the Internal Auditors and the Auditors, the Company's guidelines and policies with respect to risk assessment, risk management, internal control over financial reporting and disclosure controls and procedures. Understand any material changes to policies due to changes in systems, technology, management structure or other processes for disclosure consideration.

4. Discuss with management and the Auditors the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under applicable standards.

5. Review generally with management and the Auditors, as appropriate, earnings press releases, as well as the substance of financial information and earnings outlook provided to analysts and ratings agencies. The Chairperson of the Committee may represent the entire Committee for purposes of this discussion.

6. Review periodically, either individually or as a committee, and discuss with management and the Auditors, as appropriate, the

Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

7. Review with management, the Internal Auditors and the Auditors significant issues that arise regarding accounting principles and financial statement presentation, including the adoption of new, or material changes to existing, critical accounting policies or to the application of those policies; the potential effect of alternative accounting policies available under GAAP and the treatment recommended by the Auditors; the Company's disclosure of non-GAAP financial measures; the potential impact of regulatory and accounting initiatives; any off-balance sheet structures and any other significant reporting issues and judgments.

8. Review and discuss with management the Company's capital return program and make recommendations to the Board regarding the Company's capital return program for both dividends and share repurchases.

38. Concerning legal compliance and risk management, the Audit Committee Charter states:

23. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, including the confidential and anonymous submission by employees of concerns regarding questionable

accounting or auditing matters as required by applicable law and as deemed appropriate.

24. Investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate. The Chairperson of the Committee may represent the entire Committee in making such determination.

25. Review periodically with senior management, in conjunction with the NCGC, any proposed revisions to, and compliance with, the Company's Code of Conduct and Financial Team Code of Conduct.

26. Review, at least annually, and approve the Company's decision to enter into swaps or other derivative transactions that are exempt from exchange-execution and clearance under "end-user exception" regulations established by the Commodity Futures Trading Commission, and review and discuss with management the Company's global treasury activities and policies, including the Company's Foreign Exchange Policy and the Company's use of swaps.

27. Review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, including financial and accounting. Areas of focus shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk

exposures, insurance coverage and strategies, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risk.

28. Assist the Board in its oversight of cybersecurity matters, and review the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security risks.

29. Review and discuss with management the Company's global tax principles and strategy, tax planning activities, as well as any significant tax developments affecting the Company, and related risks.

30. Prepare annually a report to stockholders as required by the SEC and to be included in the Company's proxy statement.

31. Report to the Board with respect to material issues that arise regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements related to the Company's financial statements, reporting, internal control over financial reporting, or disclosure controls and procedures, the performance or independence of the Auditors, the performance of the Company's internal audit functions or such other matters as the Committee deems appropriate from time to time or whenever it shall be called upon to do so.

32. Review, discuss and assess at least annually its own performance as well as the Committee's role and responsibilities as outlined in this Charter. 33. Perform any other activities consistent with this Charter, the Company's Bylaws, and governing law, as the Committee or the Board deems necessary or appropriate. Perform such other functions and have such powers as may be necessary or appropriate in the efficient and lawful discharge of the foregoing.

39. Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Duties Pursuant to the Company's Code of Conduct**

40. The Individual Defendants, as officers and/or directors of NVIDIA, were also bound by the Company's Code of Conduct (the "Code")4 which, according to the Code, sets out basic principles to guide all directors, officers, and employees of NVIDIA, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

41. Concerning the Company's "Core Values," the Code says the following about doing what is best for the Company:

We foster an environment of transparency, openness, and sharing information. One that motivates our employees and empowers them to

[4] Available at https://images.nvidia.com/aem-dam/en-zz/Solutions/about-us/NVIDIA-Code-of-Conduct-External.pdf.

work as a single integrated team. We disagree openly and directly because conflict is essential to resolving differences, improving ideas, and achieving alignment. Our focus is on substance, not style. ***By putting the interests of the company before our own, we can more easily accomplish NVIDIA's vision.***[5]

42. Concerning ethical decision-making, the Code states:

> When making decisions, we take the time to consider the implications of our actions regarding the law, Our Codem and other NVIDIA policies.

> We ask ourselves what the impact would be if our conduct or action became public or came to the attention of respected colleagues.

> When it comes to ethical conduct, we err on the side of caution. If we're unsure of what to do, we ask our manager, our human resources or legal department representative, or NVIDIA-Compliance.

43. Concerning conflicts of interest, the Code states:

**We avoid conflicts of interest.**

> We make decisions in the best interests of NVIDIA.

---

[5] All emphasis added unless otherwise stated.

> ***We avoid situations where out actions might create a conflict—actual or potential—between our personal gain and obligations to NVIDIA.*** If such conflicts arise, we immediately remove ourselves from any decision-making role in the matter.

> We don't trade in derivatives of, short sell, or hedge NVIDIA's securities at any time, due to their potential to create a conflict of interests with NVIDIA's long-term objectives.

> If involved in a situation that could present a perceived or actual conflict of interest, contact Employment Legal for guidance.

* * *

**The following types of activities *may* create a conflict of interest:**

> Advisory roles or board seat participation

> Outside employment or consulting

> Self-employment or volunteering (Inventions or app development, speaking or publishing opportunities, teaching or research at a university level or higher, game development)

> Investment or ***personal relationships***

44. Concerning legal compliance, the Code states:

**We comply with laws governing international trade.**

> *Our products, services, and technologies must comply with the import and export regulations of the U.S.*, as well as all other countries where they are made available.

> Seek guidance from NVIDIA Global Trade to ensure that these transfers comply with applicable laws.

45. Concerning disclosure obligations, the Code states:

**We meet our disclosure obligations.**

> We're committed to full, fair, accurate, timely, and clear disclosure in reports and documents that we file with or submit to government agencies, as well as in other public communications or in material that we develop for internal use.

46. Concerning the accuracy of business records, the Code states:

**We maintain accurate business records.**

> We create business records that are complete, timely, understandable, and reflective of the truth of the underlying transaction or event. Always retain, protect, and dispose of such records according to policy.

> We only sign documents and contracts that we are authorized to sign.

> Email and other electronic communications may be business records. Avoid exaggeration, derogatory language and other expressions that could be taken out of context or are in violation of company policy.

47. Concerning protecting confidential information, the Code states:

**We uphold confidentiality.**

> We protect confidential or proprietary information whether it belongs to NVIDIA or to others.

> We keep documents, emails, and other information confidential and only disseminate them outside of NVIDIA when required for business reasons and with appropriate confidentiality agreements.

> When we choose to release information, we must ensure that we do so through the right channels and in a manner that properly protects NVIDIA and any confidential information, regardless of its owner.

48. Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

49. The Individual Defendants, because of their positions of control and authority as directors and/or officers of NVIDIA, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by NVIDIA.

50. Because of their advisory, executive, managerial, and directorial positions with NVIDIA, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of NVIDIA.

51. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of NVIDIA and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

52. To discharge their duties, the officers and directors of NVIDIA were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of NVIDIA were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making

accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how NVIDIA conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that NVIDIA was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

53. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to NVIDIA and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of NVIDIA, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of NVIDIA, the absence of good faith on their part, and a reckless disregard for their duties to NVIDIA and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to NVIDIA.

54. The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

55. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action

that alleges violations of the federal securities laws. As a result, NVIDIA has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

56. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

57. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

58. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

59. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the

conspiracy, common enterprise, and/or common course of conduct complained of herein.

60. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

61. On October 9, 2025, The New York Times published an article entitled "A Mystery C.E.O. and Billions in Sales: Is China Buying Banned Nvidia Chips?" The article's subheading reads "an executive of a Singaporean firm called Megaspeed socialized with Nvidia's Jensen Huang. Now the company is being scrutinized by U.S. officials for its ties to China," and the article states, in pertinent part, the following:

> On a humid June night last year, Jensen Huang, the chief executive of Nvidia, held court with several of his company's major Asian customers at a bar with sweeping views of Taipei. They stood and toasted the booming artificial intelligence industry.
>
> ***Next to the Nvidia chief was a woman named Huang Le, or Alice Huang, an executive of a Singapore-based data center company called Megaspeed, which was poised to buy $2 billion of Nvidia A.I. technology over the next year.***

> ***Though Ms. Huang and Megaspeed are little-known players in the A.I. industry, their association with Nvidia and its chief executive has recently become a preoccupation in Washington.***
>
> ***Commerce Department officials have been investigating whether Megaspeed, which has close ties to Chinese tech firms, is helping companies in China sidestep American export restrictions, according to more than a half dozen current and former officials and other people familiar with the companies, who spoke on condition of anonymity to discuss an examination that is not public.***
>
> The inquiry, which is active, calls into question how closely Nvidia is tracking where its A.I. chips end up and highlights the possibility of American export laws easily being sidestepped. Megaspeed is also facing scrutiny from Singaporean police, who told The New York Times in a statement that they are investigating the company for breaching local laws, without elaborating further.

62. The articles goes on to quote John Rizzo, an NVIDIA spokesperson, as stating the following in response:

> Nvidia said there was no evidence that its chips had been smuggled into China. John Rizzo, a spokesman for Nvidia, said in a statement that the chipmaker had "engaged with the U.S. government" regarding Megaspeed. Nvidia's compliance team also looked into Megaspeed and determined it was "***wholly owned and operated by a company based and headquartered outside China, with no China shareholders***," he said.

> Mr. Rizzo said Nvidia had visited Megaspeed's facilities multiple times. During a visit this week, he said Nvidia employees "found no evidence of diversion, and confirmed what we previously observed — Megaspeed is running a small commercial cloud, like many other companies throughout the world, as allowed by U.S. export control rules."

63. With regard to Defendant Huang's relationship with Alice Huang, the article went on to say the following, in pertinent part:

> ***It is not clear when Mr. Huang and Ms. Huang, who are not related, first met. She was mingling with a crowd of tech executives just after midnight at the Taipei bar in early June of last year when she offered to ask Mr. Huang of Nvidia to join them, recalled Parker Schmitt, an executive who was with the group.***
>
> "She said, 'I bet you guys I can get Jensen here,' and then Jensen immediately showed up," Mr. Schmitt said, referring to Mr. Huang by his first name. Photos posted to LinkedIn by NetThunder, a data software provider where Mr. Schmitt is chief executive, show Mr. Huang at the bar with the group.
>
> Shortly after Ms. Huang reached out, Mr. Huang arrived in his trademark black leather jacket and drank a whiskey shot with the group. He was accompanied by two other Nvidia executives and had planned to attend the party, said a person close to the company.

64. NVIDIA spokesperson John Rizzo was further quoted as saying ***"[o]ur field operations teams often host groups of customers and partners at conferences,***

***and when Jensen is available, may ask him to visit to provide updates on the market[.]"***

65. On October 29, 2026, just over one year after the original article discussing Defendant Huang's connections to Alice Huang and Megaspeed, The New York Times published an article entitled "Nvidia Chief Seen as Target of Chinese Spy Plot." The article states, in pertinent part, the following:

> American spy agencies had gathered striking intelligence.
>
> A top executive at a Singapore-based data center company was under scrutiny for possibly steering advanced Nvidia A.I. chips to China. And now American officials had concluded that she was a Chinese intelligence asset, funneling information to Beijing.
>
> But what came next was even more alarming. Surveillance of the executive, Alice Huang or Huang Le, a Chinese citizen, revealed that she had developed a close relationship with Jensen Huang, Nvidia's chief executive.
>
> For years, Washington has worked to deny China the technology needed to match or surpass the United States in the intense global competition for superiority in artificial intelligence. The discovery that Beijing was getting reports from someone with direct access to Mr. Huang, one of the most powerful figures in the A.I. revolution as well as an influential ally of President Trump's, set off alarms at the White House.
>
> Roughly a year ago, Mr. Trump was briefed about the intelligence findings, which have not been previously reported, and chose not to do

anything with the information. Mr. Trump has been wary of disrupting Nvidia's chip sales, which are helping to drive the economy and the stock market, and of further complicating the trading relationship with China.

This account is based on interviews with people briefed on the surveillance, who spoke on the condition of anonymity because the findings are drawn from classified intelligence, as well as other officials and industry executives and analysts.

American officials already suspected that Ms. Huang was helping China evade constraints on its ability to gain access to advanced A.I. chips.

***But the revelation that she was feeding information directly to Beijing raised more troubling possibilities, including that Ms. Huang had insights into Mr. Trump's thinking on an issue of vital importance to both nations, one likely to come up when the president visits China next month. And it left questions about whether she could be gleaning information about Nvidia, which as much as any company accounts for the lead the United States has maintained in developing cutting-edge A.I. models.***

66. The article goes on to discuss intelligence assessments regarding Defendant Huang's potential awareness of Alice Huang's potential identity as a Chinese spy:

When Mr. Trump was initially briefed on the intelligence last year, U.S. officials did not believe the Nvidia executive knew that Ms. Huang was gathering information for the Chinese. ***It is unclear whether intelligence***

> ***officials have since updated their assessment, but some senior officials inside the Trump administration doubt that Mr. Huang could have remained unaware of what they had concluded was her intelligence-gathering role for China.***

67. The article goes on to discuss investigations in Megaspeed, particularly indications that Megaspeed was acting as an intermediary to help China evade export restrictions imposed by the U.S. government on NVIDIA's products:

> ***The U.S. government has been investigating Megaspeed since late 2024, when a Commerce Department official visited its data center in Malaysia and found the site to be suspicious.*** The Nvidia equipment was still packed in boxes, suggesting it was being shipped in or out rather than installed there.
>
> Singapore has conducted its own investigation into Megaspeed. In 2025, Singaporean authorities brought Ms. Huang in for questioning, but subsequently released her.
>
> * * *
>
> ***Megaspeed is essentially a middle man.*** It has bought Nvidia chips from the American arm of Inspur, a Chinese server maker. The U.S. has blacklisted Inspur's parent company for funneling technology to the Chinese military, though the U.S. firm remains free of sanctions.
>
> Megaspeed has then provided that computing power to Alibaba and other Chinese companies. U.S. officials believe the firm is one piece of a sprawling international effort by Chinese companies to access the chips

> needed to build and run A.I. ***Investigators suspect that some Nvidia chips acquired by Megaspeed are also finding their way illegally into China.***

68. NVIDIA spokesperson John Rizzo was quoted as stating the following:

> "***Jensen's interactions with Ms. Huang are not unusual or unexpected. Meetings with customers are part of a C.E.O.'s job; Jensen talks with thousands of customer executives every year.***"

69. On October 30, 2026, Bloomberg published an article entitled "Nvidia CEO Says Ties to Company in Spy Probe Were 'Normal'." The article stated, in pertinent part, the following:

> ***[Jensen Huang] said the chipmaker's dealing with Megaspeed International were "normal and not unusual"*** following a New York Times Report that one of the Singapore firm's executives is under investigation for spying on behalf of China.
>
> Nvidia's relationship with Megaspeed's officials was proper, and the chipmaker has checked to ensure that Megaspeed didn't illegally send its [AI] processors to China, Huang said in an interview Thursday. ***That country is barred from buying Nvidia's powerful AI chips – known as graphics processing units, or GPUs—under US export rules.***
>
> ***"We've studied all their deployments of our GPUs and counted every one,"*** [Jensen Huang] said in the interview. "And I think the US government also has as well."

> The remarks follow a Times story that the US government is investigating an executive from Megaspeed for allegedly providing information to the Chinese government. ***Huang Le has previously been pictured with Nvidia's leader on social media, and the story reports that she may have been serving as a Chinese agent aiming to evade chip export controls.***

70. The statements discussed herein, supra, were materially false and/or misleading when made because they failed to disclose adverse material facts about the Company, including, inter alia, that: (i) Defendant Huang had an affair with Alice Huang, an executive at Megaspeed, despite ongoing scrutiny of Ms. Huang and Megaspeed by the United States government over Chinese espionage concerns; (ii) the Company was aware of the concerns surrounding Alice Huang and Megaspeed, but failed to fully investigate their connections with Chinese espionage; (iii) as a result of the foregoing espionage concerns, Defendant Huang's affair with Alice Huang created a personal conflict of interest that put NVIDIA at risk of helping China evade export controls on NVIDIA's chips; and (iv) as a result, Defendant made or caused the Company to make materially false and/or misleading public statements throughout the Relevant Period pertaining to Defendant Huang's affair and the Company's connection to Megaspeed.

**The Truth is Revealed**

71. On November 8, 2026, NVIDIA issued a statement from its board of directors, which stated the following:

> ***The NVIDIA Board is initiating an independent investigation in light of recent reporting that founder and CEO Jensen Huang has been the target of a foreign intelligence effort.***

> A committee of independent directors, assisted by outside independent counsel, will oversee the investigation.
>
> The Board prioritizes U.S. national and economic security, which is paramount to the interests of NVIDIA and its shareholders.
>
> While the Board has no reason to believe that either national security or NVIDIA secrets were compromised, the Board's inquiry will examine all available information.

72. Also on November 8, 2026, The New York Times published an article entitled "Nvidia Opens Investigation into Jensen Huang's Relationship With Suspected Chinese Spy." The article stated as a subheading that "Mr. Huang[,] ***acknowledged on Sunday that he was intimate with a business executive who U.S. officials had determined was working for Chinese intelligence.***"

73. The article further stated:

> Nvidia said on Sunday that it was opening an investigation into Jensen Huang, its chief executive and co-founder, ***after he acknowledged to the company's board that he had been intimate with a business executive who U.S. intelligence determined was a Chinese spy.***
>
> ***Mr. Huang's relationship with the woman, who goes by Alice Huang, became a U.S. government concern after surveillance revealed that she was feeding information directly to Beijing.*** The revelation raised troubling possibilities because Mr. Huang is one of the most powerful

> figures in the A.I. revolution as well as an influential ally of President Trump.
>
> In a message to the company, Mr. Huang apologized. ***"I was unfaithful to my wife," he said. "My actions hurt her and our children. There is no excuse for what I did. I am deeply sorry."***

74. On this news, NVIDIA stock fell $7.97 per share, or approximately 4.3%, to close at $178.67 on November 9, 2026. Since then, NVIDIA's stock price has fallen even further, opening at $159.00 on November 16, 2026, constituting a drop of $27.64 or 14.8%. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company and its shareholders have suffered significant losses and damages.

**Materially False and Misleading Proxy Statement**

75. On May 12, 2026, the Company filed the 2026 Proxy Statement with the SEC. Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven solicited the 2026 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

76. The 2026 Proxy Statement called for Company shareholders to vote on, inter alia, re-electing Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven to the Board.

77. With respect to the Company's Code of Conduct, the 2026 Proxy Statement stated:

> Our directors, executives, and employees are expected to conduct themselves with the highest degree of integrity, ethics, and honesty. Our credibility and reputation depend upon their good judgment, ethical standards, and personal integrity. Our Code of Conduct applies to all

executive officers, directors, and employees, including our principal executive officer, principal financial officer, and principal accounting officer. The Financial Team Code of Conduct applies to our executive officers, directors, members of our finance department, and all employees involved in the preparation and review of externally-reported periodic financial reports, filings, and documents. We regularly review our Code of Conduct and related policies to ensure that they provide clear guidance to our directors, executives, and employees. We also regularly train our employees on our Code of Conduct and other policies.

The Code of Conduct and the Financial Team Code of Conduct may be viewed in the Investor Relations section of our website at www.nvidia.com. If we make any amendments to either code, or grant any waiver from a provision of either code to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website or in a report on Form 8-K. Information contained on our website is not incorporated by reference into this or any other report we file with the SEC.

78. Regarding the "Board of Directors' Role in Risk Oversight," the 2026 Proxy Statement stated the following:

The Board reviews risks, oversees risk management, and delegates oversight of appropriate topics to its committees to support the Company's long-term objectives. The oversight responsibility of our Board and its committees is enabled by management reporting processes, including our ERM process, that are designed to provide visibility to our Board about the identification, assessment, and management of critical

risks and management's risk mitigation strategies. Our Board retains direct oversight of strategic risks to NVIDIA and other risk areas not delegated to its committees. Delegation to Board committees enhances risk oversight by allocating authority and responsibility to the committee best suited to oversee specific risks, as outlined in their charters, with escalation to the full Board when appropriate. Committee chairpersons regularly report to the full Board on reviewed matters, including key risks, and collaborate with the Board to ensure effective risk management oversight. The Board believes its leadership structure facilitates robust risk oversight, with the independent Lead Director and independent committees proactively engaging with management. For further details, see Board Leadership Structure above.

The Board retains full oversight of information security matters, including cybersecurity. The AC reviews the adequacy and effectiveness of the Company's information security policies, practices, and internal controls. The AC receives regular updates on information security from management, including the Chief Security Officer and security team, while the Board receives annual reports on these matters. The AC also meets in executive session with leaders of key control functions, ensuring direct access to management teams and appropriate staffing and resources.

The Company's ERM process is an annual assessment of its risk environment, integrating risk evaluation with the Company's operations and strategies. This process examines internal and external factors, risk amplifiers, and emerging trends to prioritize mitigation efforts based on

> the risk horizon. It evaluates the potential impact and likelihood of risks materializing over relevant timeframes, considers future threats and trends, and identifies the actions, strategies, processes, controls, and procedures in place or to be implemented to manage and mitigate these risks.
>
> While the Company does not have a Chief Compliance Officer, the ERM process and action plan are reviewed by the CEO, other NEOs reporting directly to the CEO, and senior management members. These leaders are responsible for managing and monitoring key risks within their respective functional areas. The Company's internal audit team administers the ERM program on behalf of management.
>
> The ERM process is designed to align the Board's risk oversight with the Company's disclosure controls and procedures. Management involved in the ERM process prepares reports that are reviewed by the Board or its committees to ensure that disclosure controls and procedures function effectively.

79. Regarding the "Corporate Governance Policies" the 2026 Proxy Statement stated the following:

> The Board has adopted Corporate Governance Policies to ensure that the Board has the necessary authority and processes in place to review and evaluate our business operations as needed and to make decisions that are independent of our management. These policies include practices the Board follows with respect to its composition and selection, regular evaluations of the Board and its committees, Board meetings and

involvement of senior management, senior management development, and Board committees and compensation. These policies may be viewed in the Investor Relations section of our website at www.nvidia.com.

80. Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven caused the 2026 Proxy Statement to be false and misleading by failing to disclose, inter alia, that China may have been buying the banned NVIDIA chip, China drove a significant portion of 2026 compute revenues, that Commerce officials were actively investigating whether Megaspeed was helping Chinese companies evade U.S. export restrictions, that Mr. Huang was involved in a romantic or personal relationship with Ms. Huang. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

81. The 2026 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (i) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (ii) failing to report violations of the Code of Conduct. Further, the 2026 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

82. As a result of Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven causing the 2026 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to re-elect Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

## DAMAGES TO THE COMPANY

83. NVIDIA has been, and will continue to be, severely damaged and injured by the Defendants' misconduct. As a direct and proximate result of the Defendants' conduct, NVIDIA has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

84. costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

85. substantial loss of market capital;

86. costs already incurred and to be incurred defending the pending securities fraud class action lawsuit pending before this Court; and

87. any fines or other liability resulting from the Company's violations of federal law.

88. In addition, NVIDIA's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired. The credibility and motives of management are now in serious doubt.

89. The wrongdoing complained of herein has irreparably damaged NVIDIA's corporate image and goodwill. For at least the foreseeable future, NVIDIA will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that NVIDIA's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

90. Plaintiff brings this action derivatively in the right and for the benefit of NVIDIA to redress injuries suffered, and to be suffered, by NVIDIA as a direct result of violations of federal securities laws by the Defendants. NVIDIA is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

91. The Board of NVIDIA, at the time this action was commenced, consisted of Defendants Coxe, Dabiri, Hudson, Johnson, Jones, Lora, Neal, Seawell, Shah, and Stevens a total of eleven (11) individuals.

92. Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the NVIDIA Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

93. Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

94. Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to the Audit Committee Defendants**

95. Demand is futile as to Defendants Jones, Coxe, Johnson, Lora, Seawell, and Shah (the "Audit Committee Defendants") as members of the Audit Committee for their knowing failure to fulfill their responsibilities.

96. The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee. The duties of the Audit Committee are set forth herein, supra.

97. Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

98. The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information by failing to disclose that: (i) Defendant Huang had an affair with Alice Huang, an executive at Megaspeed, despite ongoing scrutiny of Ms. Huang and Megaspeed by the United States government over Chinese espionage concerns; (ii) the Company was aware of the concerns surrounding Alice Huang and Megaspeed, but failed to fully investigate their connections with Chinese espionage; (iii) as a result of the foregoing espionage concerns, Defendant Huang's affair with Alice Huang created a personal conflict of interest that put NVIDIA at risk of helping China evade export controls on NVIDIA's chips; and (iv) as a result, Defendant's made or caused the Company to make materially false and/or misleading public statements throughout the Relevant Period pertaining to Defendant Huang's affair and the Company's connection to Megaspeed. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to the Director Defendants**

99. Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

100. Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

101. Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

102. Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

**COUNT I**

**Against the Individual Defendants for**
**<u>Violations of Section 14(a) of the Exchange Act</u>**

103. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

105. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

106. Under the direction and watch of the Individual Defendants, the 2024 Proxy Statement failed to disclose that: (i) Defendant Huang had an affair with Alice Huang, an executive at Megaspeed, despite ongoing scrutiny of Ms. Huang and Megaspeed by the United States government over Chinese espionage concerns; (ii) the Company was aware of the concerns surrounding Alice Huang and Megaspeed, but failed to fully investigate their connections with Chinese espionage; (iii) as a result of the foregoing espionage concerns, Defendant Huang's affair with Alice Huang created a personal conflict of interest that put NVIDIA at risk of helping China evade export controls on NVIDIA's chips; and (iv) as a result, Defendant's made or caused the Company to make materially false and/or misleading public statements throughout the Relevant Period pertaining to Defendant Huang's affair and the Company's connection to Megaspeed.

107. The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements

contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, the re-election of the directors.

108. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2026 Proxy Statement.

109. Plaintiff on behalf of NVIDIA has no adequate remedy at law.

**COUNT II**

**Against the Securities Action Defendants for Contribution Under Section 10(b) of the Exchange Act, Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

110. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111. As a result of the conduct and events alleged above, NVIDIA has been named as a defendant in the Related Securities Action brought on behalf of NVIDIA shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

112. Federal law provides NVIDIA with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular, under the Supreme Court's decision in Musick, Peeler & Garrett v. Employers Insurance of Wausau, 508 U. S. 286, NVIDIA has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling NVIDIA to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action and sets forth specific rules regarding the determination of claims for such contribution.

113. Accordingly, Plaintiff, on behalf of NVIDIA, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with NVIDIA under Rule 10b-5, or if joined in such actions, would be liable for the same damages as NVIDIA.

114. NVIDIA claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

## Allegations Regarding the Securities Action Defendants

115. Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects. These statements were materially misleading to persons who purchased NVIDIA securities during the Relevant Period.

116. The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing NVIDIA securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

117. The damages suffered by said investors were caused by reason of the fact that: (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

118. The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

119. When the Securities Action Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged in detail herein, due to their positions as employees and/or directors of NVIDIA, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

120. Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if NVIDIA were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on behalf of NVIDIA.

**Allegations Regarding the Securities Action Defendants as Control Persons**

121. In acting as alleged above, the Securities Action Defendants were acting as authorized agents of NVIDIA in their roles as directors and/or employees. Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

122. The Securities Action Defendants were "controlling persons" of NVIDIA within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action. Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

123. Plaintiff hereby derivatively claims such right of contribution on behalf of NVIDIA.

## COUNT III

**Against the Individual Defendants for Breaches of Fiduciary Duty**

124. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125. The Individual Defendants owed and owe NVIDIA fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe NVIDIA the highest obligation of good faith, loyalty, and due care.

126. The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to NVIDIA shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period. These actions could not have been a good faith exercise of prudent business judgment.

127. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused NVIDIA to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to NVIDIA and its shareholders. As a result, the Individual Defendants grossly mismanaged the Company.

128. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

129. Plaintiff, on behalf of NVIDIA, has no adequate remedy at law.

**COUNT IV**

**Against all the Individual Defendants for Unjust Enrichment**

130. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of NVIDIA.

132. The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to NVIDIA.

133. Plaintiff, as a shareholder and representative of NVIDIA, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

134. Plaintiff, on behalf of NVIDIA, has no adequate remedy at law.

**COUNT V**

**Against the Individual Defendants for Abuse of Control**

135. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136. The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of NVIDIA and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the reporting of the Company's financials and lack of related internal control.

137. As such, the Individual Defendants have abused their positions of control with the Company and are legally responsible.

138. Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

## COUNT VI

## **Against the Individual Defendants for Gross Mismanagement**

139. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140. The Individual Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company. Furthermore, the Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

141. Through the wrongful acts complained of herein, the Individual Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

142. By committing the misconduct alleged herein, the Individual Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of NVIDIA's affairs and in the use and preservation of NVIDIA's assets.

143. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused NVIDIA to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to NVIDIA, thus breaching their duties to the Company.

144. As a result, the Individual Defendants grossly mismanaged NVIDIA and should be liable to the Company for the resulting damages.

**COUNT VII**

**Against the Individual Defendants for Waste of Corporate Assets**

145. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Related Securities Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

147. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

148. Plaintiff, on behalf of NVIDIA, has no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of NVIDIA and that Plaintiff is an adequate representative of the Company;

B. Determining and awarding to NVIDIA the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C. Directing NVIDIA and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect NVIDIA and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of

Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

(1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D. Determining and awarding to NVIDIA exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E. Awarding NVIDIA restitution from Defendants, and each of them;

F. Awarding NVIDIA Contribution from Securities Action Defendants, and each of them;

G. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H. Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: November 18, 2026

REICH RADCLIFFE & HOOVER LLP

By: */s/ Adam T. Hoover*
ADAM T. HOOVER

Joshua M. Lifshitz
LIFSHITZ LAW PLLC
*Attorneys for Plaintiff*

**VERIFICATION**

I, Steve Schnipper hereby declare as follows:

I am shareholder of NVDA and have continuously so owned the Company's common stock during the relevant period. I declare that I am the plaintiff named in the foregoing Shareholder Derivative Complaint ("Complaint"), and know the content thereof; that the pleading is true to my knowledge, except as to those matters stated on information and belief, and that as to such matters I believe to be true. I declare under penalty of perjury that the foregoing is true and correct.

Executed on 11/18/2026



Signature